UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: July 15, 2016
```

-------------------------------------------------------------X

CARLOS A. GUZMAN TORRES,                           :
                                                   :
                              Plaintiff,           :          15-cv-1382 (KBF)
                                                   :
              -v-                                  :          OPINION & ORDER
                                                   :
COMMISSIONER OF SOCIAL SECURITY,                   :
                                                   :
                              Defendant.           :
                                                   :
-------------------------------------------------------------X

KATHERINE B. FORREST, District Judge:

      Plaintiff Carlos Alberto Guzman Torres seeks review of the decision by defendant Commissioner of Social Security that found that he was not disabled and not entitled to Supplemental Security Income benefits under Title XVI of the Social Security Act (the "Act").

      Plaintiff filed a claim for Supplemental Security Income in June 2012. (Tr. 18, 69, 159-67.)[1] That initial application was denied in August 2012, (Tr. 69, 86-89), and plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 90-92.) The hearing was held on June 21, 2013 before ALJ Michael A. Rodriguez. (Tr. 33-60.) In a written decision dated September 27, 2013, ALJ Rodriguez found that plaintiff was not disabled under the Act. (Tr. 12-32.) Plaintiff requested that the Appeals Council review the ALJ's decision; that request was denied on January 16, 2015. (Tr. 1-11.)

---

[1] Citations to "Tr." refer to pages of the administrative record.

On February 25, 2015, plaintiff filed this action seeking judicial review of the ALJ's September 27, 2013 decision. (ECF No. 1.)  Now before the Court are the parties' cross-motions for judgment on the pleadings. (ECF Nos. 10, 16.)  For the reasons set forth below, defendant's motion is GRANTED, and plaintiff's motion is DENIED.

I.    FACTUAL BACKGROUND[2]

Plaintiff is a forty-four year old man. (Tr. 61.)  He has either an eighth- (Tr. 38), or ninth-grade education, (Tr. 179), completed in Puerto Rico.  Plaintiff alleges that he suffers from depression, hearing problems, problems with his right forearm, a blood clotting disorder, and a history of heart attack. (Tr. 61, 178.)  Plaintiff reported working as a gardener in Puerto Rico, (Tr. 176, 179), but allegedly became unable to work on May 1, 2012. (Tr. 178.)

A.    Medical Evidence Before the ALJ

1.    Treating Physician Evidence

The Administrative Record in this case contains several documents conveying the actions, observations, and opinions of doctors who treated plaintiff for the impairments that constitute his alleged disability.  This treating physician evidence covers a period of April 2012, which was shortly before plaintiff's alleged disability onset date, through June 2013, the date of plaintiff's hearing before ALJ Rodriguez. Because evidence from treating physicians is entitled to particular consideration, the Court recounts this evidence at some length below.

---

[2] The Court recites here only those facts relevant to its review.  A further recitation of plaintiff's medical history is contained in the Administrative Record.

In April 2012, plaintiff visited Bronx Lebanon Hospital reporting headache, left-sided chest pain, dizziness, and tongue numbness.  (Tr. 242.)  Although ultrasound results indicated that plaintiff did not have Deep Vein Thrombosis (DVT) in his left lower extremity, (Tr. 247), plaintiff's diagnosis at discharge on April 9, 2012 was chronic DVT.  (Tr. 242.)  Drs. Vijaya Perugu and Madanmohan Patel, the doctors who treated plaintiff on this occasion, prescribed an anticoagulant, but plaintiff refused to take this medication.  (Id.)  Plaintiff was discharged with a prescription for a pain medication, an antidepressant, and an anticoagulant.  (Tr. 243.)  At discharge, plaintiff was told to follow up with an anticoagulant specialist.  (Tr. 242-43.)

On May 21, 2012, plaintiff visited Dr. Cecilia Calderon of CCN General Medicine.  (Tr. 252-53.)  She diagnosed deep vein thrombosis, smoker's cough, and hearing loss, and prescribed nicotine replacement therapy, multiple pain medications, and an anticoagulant.  (Tr. 252-53.)  Dr. Calderon also referred plaintiff for a chest X-ray.  (Tr. 256-57.)

On June 11, 2012, plaintiff filed a claim for Supplemental Social Security Income.  (Tr. 18, 69, 159-67.)

On July 16, 2012, Snyde Simbert, an audiologist at Bronx Lebanon Hospital, tested plaintiff's hearing and referred him to HearRx.  (Tr. 285.)

On October 8, 2012, Dr. Calderon completed a Medical Source Statement setting forth her view of plaintiff's limitations.  (Tr. 452-59.)  Dr. Calderon listed diagnoses of deep vein thrombosis in the left leg and depressive disorder.  (Tr. 453.)

She stated that plaintiff exhibited symptoms of constant pain in his left calf, which required him to keep the leg elevated when sitting, and had side effects of upset stomach and drowsiness from his medication.  (Tr. 453-55.)  Dr. Calderon further indicated plaintiff could frequently carry up to 50 pounds, frequently flex his neck downward, upward, right, and left and occasionally balance and stoop, and constantly use his right and left hands without limitation for reaching, handling or working with his fingers.  (Tr. 457-58.)  She reported that plaintiff did not medically require a hand-held assistive device for walking or standing.  (Id.)  Finally, she stated that, due to his impairments, plaintiff would be absent from work more than three times a month.  (Tr. 458-59.)

On October 9, 2012, plaintiff visited HearRx where audiologist Magdalena Sarria evaluated plaintiff's hearing test results from Bronx Lebanon Hospital.  (Tr. 286.)  Ms. Sarria found that the results showed mixed hearing loss that may be associated with voiceless speech sounds and difficulty hearing in noisy and distance environments.  (Id.)  She recommended plaintiff wear a hearing aid in his left ear and ordered a hearing aid for plaintiff.  (Tr. 286-88.)

On December 1, 2012, plaintiff was admitted to Bronx Lebanon Hospital because of sharp, sudden chest pain on his left side; his chest pain was aggravated by deep breathing, radiated to his neck, and was associated with shortness of breath.  (Tr. 323.)  Plaintiff's test results from a general physical examination were normal except for posterior neck tenderness.  (Tr. 348.)  A cardiovascular examination showed plaintiff had normal heart rate and sounds.  (Tr. 349.)  A chest

4

X-ray showed plaintiff's lungs were normally inflated and clear, his heart was normal size, and there was no sign of acute congestive heart failure or pleural effusions.  (Tr. 356.)  Plaintiff's computed tomography (CT) scan showed no evidence of evidence of carotid artery dissection or stenosis, although the scans were "suboptimal" because plaintiff moved during the scan.  (Tr. 358-59.)  Plaintiff's test results from an echocardiogram and an echocardiography stress test were normal.  (Tr. 344.)  Because the attending physician, Dr. Yair Lev, could not find any records at Bronx Lebanon Hospital indicating plaintiff had DVT, he recommended, with Dr. Calderon's consultation, that plaintiff discontinue using an anticoagulant and take aspirin instead.  (Tr. 343-44.)  Dr. Lev also recommended plaintiff follow up with Dr. Calderon.  (Tr. 343.)

On December 15, 2012, plaintiff visited Lincoln Medical and Mental Health Center, reporting feeling depressed and suicidal ideation.  (Tr. 388-440.)  Plaintiff stated that "he no longer want[ed] to live," and that he had pills at his home he could use to kill himself.  (Tr. 392, 414.)  Plaintiff reported that he was depressed because of his hearing impairment from a construction accident and because his mother, who lives in Puerto Rico, had cancer.  (Tr. 403.)  On December 16, 2012, during a progress evaluation, Dr. Christian Gonzalez noted that plaintiff presented as irritable, marginally cooperative, with poor speech and constricted affect.  (Tr. 399.)  Dr. Gonzalez further noted that plaintiff reported that he was depressed because he had a stroke after moving to New York City which left him with weakness on his left side and, as a result, unable to work.  (Id.)

5

Plaintiff was discharged on December 17, 2012, because he stated he was no longer feeling suicidal or hopeless and wanted to be discharged. (Tr. 396.) Plaintiff was discharged with instructions to take 150mg Wellbutrin, an antidepressant, his usual dose. (Id.)

On May 1, 2013, plaintiff visited Martin Luther King Wellness Center and was seen by Dr. Joe Baez because he was having active suicidal thoughts and hearing voices. (Tr. 442.) A Spanish interpreter participated in their meeting. (Id.) Plaintiff complained that he was unable to sleep despite taking Ambien and that Wellbutrin was depressing his sexual function. (Tr. 443.) Dr. Baez observed that plaintiff had no psychomotor disturbance and was alert and oriented. (Id.) Dr. Baez also noted that plaintiff was cooperative and pleasant and had not had significant recent weight loss or gain. (Tr. 442-44.) He doubled plaintiff's dose of Wellbutrin and substituted Trazodone, an antidepressant and sedative, for Ambien. (Tr. 443.)

On the same day, May 1, 2013, Dr. Baez completed a Medical Source Statement setting forth his views as to plaintiff's limitations. (Tr. 466-472.) The statement indicated that Dr. Baez was seeing plaintiff biweekly. (Tr. 467). The statement also indicated that plaintiff had poor memory, appetite disturbance with weight change, sleep disturbance, mood disturbance, emotional lability, delusions or hallucinations, recurrent panic attacks, paranoia or inappropriate suspiciousness, feelings of guilt or worthlessness, difficulty thinking or concentrating, decreased energy, persistent irrational fears, generalized persistent anxiety, and hostility and

irritability.  (Id.).  Dr. Baez indicated that plaintiff had bipolar and episodic mood disorders.  (Tr. 468.)  He opined that plaintiff's impairments would cause him to be absent from work more than three times a month.  (Id.)  Dr. Baez also opined that plaintiff could sustain normal work performance for only up to one-third of an eight-hour work day, and that he had "marked loss" in remembering locations and work-like procedures, understanding and remembering short and simple instructions, understanding and remembering detailed instructions, carrying out detailed instructions, maintaining attention and concentration for extended periods, maintaining regular attendance and punctuality, sustaining an ordinary routine without special supervision, dealing with the stress of semi-skilled and skilled work, working in coordination with or proximity to others without being duly distracted, making simple work-related decisions, completing a normal workday or workweek without interruptions from psychologically based symptoms, and performing a consistent pace without an unreasonable number and length of rest periods.  (Tr. 468-69.)  Dr. Baez further opined that plaintiff would have moderate to marked loss in interacting appropriately with the public, asking simple questions or requesting assistance, accepting instructions and responding appropriately to criticism from supervisors, getting along with coworkers and peers without unduly distracting them or exhibiting behavioral extremes, maintaining socially appropriate behavior, adhering to basic standards of neatness and cleanliness, responding appropriately to changes in routine work setting, being aware of normal hazards and taking appropriate precautions, traveling in unfamiliar places, using public transportation,

and setting realistic goals or making plans independently of others.  (Tr. 470.)  Dr.
Baez noted that plaintiff's condition as outlined in the Medical Source Statement
had existed and persisted since at least 1990.  (Tr. 471.)  He opined that plaintiff
would have marked limitations in maintaining social functioning, would often have
deficiencies of concentration, persistence, or pace which would result in plaintiff's
failure to complete tasks in a timely manner, and would continually experience
episodes of deterioration or decompensation in work or work-like settings which
would result in plaintiff's withdrawal from that situation or experiencing
exacerbation of his symptoms.  (Tr. 470-71.)

Also on May 1, 2013, another physician, Dr. Maureen Kwan Kam, completed
a Medical Source Statement for plaintiff.  (Tr. 277-83.)  Dr. Kam listed diagnoses of
dyslipidemia, neck pain, arm fracture, hearing loss, abnormality of gait,
hypertension, and migraine.  (Tr. 278.)  Dr. Kam's statement indicated that plaintiff
exhibited symptoms of numbness, sharp pain in arm, headaches, fatigue, trouble
breathing, and swelling in his feet.  (Id.)  Dr. Kam reported that nausea and
stomach upsets were side effects of plaintiff's medication.  (Tr. 279.)  She opined
that plaintiff could stand or walk for less than one hour in an eight-hour work day;
never balance, stoop, or lift 21-50 pounds; only occasionally rotate his neck right,
rotate his neck left, flex his neck forward, reach with his left hand, and lift 11-20
pounds; and frequently lift 1-10 pounds, flex his neck upward, and reach with his
right hand.  (Tr. 281-82.)  Finally, Dr. Kam opined that plaintiff would likely be
absent from work as a result of his impairments more than three times per month

8

and that plaintiff's condition had existed and persisted for at least one year.  (Tr. 283.)

On May 15, 2013, plaintiff returned to Martin Luther King Wellness Center for a follow-up visit with Dr. Baez.  (Tr. 446.)  Plaintiff reported improvement with depression and anxiety but complained that he could not sleep, even with trazodone, and that he had nightmares.  (Id.)  Dr. Baez observed plaintiff was cooperative, alert, and oriented, and he recommended plaintiff decrease his dose of trazodone.  (Tr. 447.)

On June 12, 2013, plaintiff returned to Martin Luther King Wellness Center for another follow-up visit with Dr. Baez.  (Tr. 449.)  Plaintiff reported feeling episodes of depression and anxiety but that the episodes were relieved with medication.  (Id.)  Dr. Baez reported that plaintiff was cooperative, alert, and oriented, and continued plaintiff on his medications.  (Tr. 450.)

2.    Consultative Examinations

In connection with his initial Supplemental Security Income application filed in June 2012, plaintiff visited consulting physician Dr. Marilee Mescon and consulting psychologist Dr. Arlene Broska.

On July 23, 2012, Dr. Mescon examined plaintiff.  (Tr. 264-66.)  Dr. Mescon observed plaintiff was able to hear normal voice tones without difficulty, had a normal gait, could walk on heels and toes without difficulty, used no assistive devices, needed no help getting on and off the exam table, and was able to rise from his chair without difficulty.  (Tr. 264.)  She also observed his hand and finger

dexterity were intact and his grip strength was five out of five.  (Tr. 265.)  She concluded that there were no limitations in plaintiff's ability to sit, stand, climb, push, pull, or carry heavy objects.  (Id.)

Dr. Broska also examined plaintiff on July 23, 2012.  (Tr. 267-70.)  An English-Spanish translator participated in the evaluation.  (Tr. 267.)  Dr. Broska observed that plaintiff was cooperative, well-groomed, and presented adequate social skills, relating to others, and overall presentation.  (Tr. 268.)  She observed that plaintiff was able to hear and communicate in a normal tone of voice, and that he exhibited no evidence of hallucinations, delusions, or paranoia in the evaluation setting.  (Id.)  Dr. Broska concluded that plaintiff could follow and understand simple instructions, perform simple tasks independently, maintain attention and concentration, maintain a regular schedule, perform complex tasks independently, and make some appropriate decisions.  (Tr. 269.)

B.     Non-medical Evidence Before the ALJ

1.     Recent Work History

Plaintiff previously worked as a gardener in Puerto Rico earning about $350 per week.  (Tr. 179, 219)  Plaintiff was no longer working at the time of his application.  (Tr. 178.)

2.     Plaintiff's Hearing Testimony

Plaintiff was represented by counsel at his June 21, 2013 administrative hearing; a Spanish interpreter was also present.  (Tr. 35.)

Plaintiff testified that he came to the mainland United States from Puerto Rico in March 2012 to help financially support his mother, who has cancer.  (Tr. 38.) In Puerto Rico, plaintiff worked full time, off the books, as a gardener and a construction laborer.  (Tr. 38-40.)  When he arrived in New York, he got a job as a maintenance worker in a 99 Cent Store.  (Tr. 42.)  Plaintiff testified that he stopped working at the 99 Cent Store and has not had subsequent jobs because of his heart condition.  (Tr. 43.)

Plaintiff testified that he receives food stamps, public assistance, and Medicaid coverage.  (Tr. 44.)  He testified that he is living with a friend and her four-year-old son and that he is able to leave their residence for appointments.  (Tr. 44, 46, 53.)  Plaintiff further testified that he was not in a romantic relationship with anyone and is divorced from his former wife, with whom he has two children. (Tr. 44-45.)

Plaintiff testified at some length about his health conditions.  (Tr. 46-56.)  He recounted hearing loss in his right ear and wore two hearing aids to the administrative hearing.  (Tr. 46.)  He described trouble with both arms to wit: that he was shot twice in his right arm, which now contains a plate with nine screws and hurts "all the time," even with pain medicine; and that he broke his left arm when he fell from a horse at age eleven, an injury that still causes problems.  (Tr. 47-49.) Plaintiff testified about his heart condition, which he reported results in his entire left side becoming totally numb, and about his blood clotting problem, for which he previously took an anticoagulant.  (Tr. 49-50.)  Plaintiff testified that he

11

discontinued taking that medication because of the side effects, but that those side effects persist.  (Id.)

Plaintiff also testified that he has problems with his legs, feet, knees, and hips.  (Tr. 54.)  He stated that his left leg gets swollen, and that a doctor told him he needs to use a cane to walk, but that he does not use a cane because his arm becomes numb.  (Id.)  According to plaintiff, he can only be on his feet, either standing or walking, for about two blocks before he becomes short of breath.  (Tr. 56.)  He also recounted a cardiologist's suggestion that he keep his legs elevated to prevent swelling.  (Id.)

Regarding his psychological condition, plaintiff testified that he used to see a psychiatrist in Puerto Rico and that since coming to New York he has seen psychiatrist Dr. Jose Vi for depression.  (Tr. 50-52.)  He stated that his symptoms of depression are lessening, but that the medication he takes for this condition causes him to be experience dizziness, nausea, and diminished appetite.  (Tr. 52-53.)

        3.    Vocational Expert Testimony

ALJ Rodriguez did not enlist the help of a vocational expert at the hearing. (Tr. 35-60.)

        C.    ALJ Decision

Plaintiff filed a claim for Supplemental Security Income on June 11, 2012 alleging a disability onset date of May 1, 2012.  (Tr. 18, 69, 159-67.)  On September 27, 2013, after conducting the five-step sequential evaluation process, ALJ Rodriguez denied plaintiff's application.  (See Tr. 12-32.)  The ALJ found that at

step one, plaintiff had not engaged in substantial gainful activity since the date he applied for supplemental security benefits.  (Tr. 20.)  At step two, he found that plaintiff had two medically determinable impairments that are severe under the Act: depressive disorder and hearing loss.  (Id.)

At step three, however, the ALJ found that no impairment or combination of impairments met or medically equaled the severity of any impairment listed in Appendix 1.  (Tr. 21.)  In particular, he found that although plaintiff had mild restrictions to moderate difficulties—but not marked limitations—in activities of daily living, maintaining social functioning, and maintaining concentration and persistence of pace, these did not meet the relevant criteria.  (Id.)  He also found that plaintiff had no extended periods of decompensation.  (Id.)

At step four, the ALJ determined plaintiff's residual functional capacity and found that although he was unable to perform any past relevant work, he could perform a full range of unskilled low stress jobs[3] at all exertional levels.  (Tr. 22, 34.)  In addition, the ALJ found plaintiff should not be employed in a capacity involving unprotected heights, exposure to loud noises, or interaction with the public, and that any job should deal with things rather than people and involve only occasional work-related interactions with co-workers and supervisors.  (Id.)  In making his determinations, ALJ Rodriguez evaluated the record evidence, including those from treating physicians, consultative examiners, and plaintiff's hearing testimony.  (Tr. 23-26.)

---

[3] Defined as requiring no more than occasional decision-making or exercise of judgment in job performance.

13

At step five, the ALJ concluded that, based on the Medical-Vocational
Guidelines contained in 20 C.F.R. Part 404, Subpart P, App. 2, plaintiff was able to
perform jobs existing in significant numbers in the national economy.  (Tr. 27-28.)
Accordingly, the ALJ concluded that plaintiff was not disabled under the Act.  (Tr.
36.)

II.    APPLICABLE LEGAL PRINCIPLES

A.    Judgment on the Pleadings

"After the pleadings are closed—but early enough not to delay trial—a party
may move for judgment on the pleadings."  Fed. R. Civ. P. 12(c).  "The same
standard applicable to Fed. R. Civ. P. 12(b)(6) motions to dismiss applies to Fed. R.
Civ. P. 12(c) motions for judgment on the pleadings."  Bank of N.Y. v. First
Millennium, Inc., 607 F.3d 905, 922 (2d Cir. 2010) (citation omitted).  Therefore,
"[t]o survive a Rule 12(c) motion, the complaint 'must contain sufficient factual
matter, accepted as true, to state a claim to relief that is plausible on its face.' "  Id.
(quoting Hayden v. Paterson, 594 F.3d 150, 160 (2d Cir. 2010)).

B.    The Disability Standard

The Commissioner will find a claimant disabled under the Act if he or she
demonstrates an "inability to engage in any substantial gainful activity by reason of
any medically determinable physical or mental impairment which can be expected
to result in death or which has lasted or can be expected to last for a continuous
period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The claimant's
impairment must be "of such severity that he is not only unable to do his previous

14

work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." Id. § 423(d)(2)(A).  The disability must be "demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  Id. § 423(d)(3).

The Commissioner uses a five-step process when making disability determinations.  See 20 C.F.R. §§ 404.1520, 416.920.  The Second Circuit has described the process as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity.  Where the claimant is not, the Commissioner next considers whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment that is listed in 20 C.F.R. pt. 404, subpt. P, app. 1 ["Appendix 1"].  If the claimant has a listed impairment, the Commissioner will consider the claimant disabled without considering vocational factors such as age, education, and work experience; the Commissioner presumes that a claimant who is afflicted with a listed impairment is unable to perform substantial gainful activity.  Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, she has the residual functional capacity to perform her past work.  Finally, if the claimant is unable to perform her past work, the burden then shifts to the Commissioner to determine whether there is other work which the claimant could perform.

Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir. 1999) (citation and footnote omitted); see also Barnhart v. Thomas, 540 U.S. 20, 24-25 (2003); DeChirico v. Callahan, 134 F.3d 1177, 1179-80 (2d Cir. 1998).  The claimant bears the burden of proof in steps one through four, while the Commissioner bears the burden in the final step. Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012).

C.    Review of the ALJ's Judgment

The Commissioner and ALJ's decisions are subject to limited judicial review. The Court may only consider whether the ALJ applied the correct legal standard and whether his or her findings of fact are supported by substantial evidence. When these two conditions are met, the Commissioner's decision is final. See Burgess v. Astrue, 537 F.3d 117, 127-28 (2d Cir. 2008); Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998) ("We set aside the ALJ's decision only where it is based upon legal error or is not supported by substantial evidence." (citation omitted)); 42 U.S.C. § 405(g).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pratts v. Chater, 94 F.3d 34, 37 (2d Cir. 1996) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)) (internal quotation marks omitted).  If the Commissioner and ALJ's findings as to any fact are supported by substantial evidence, then those findings are conclusive.  42 U.S.C. § 405(g); Diaz v. Shalala, 59 F.3d 307, 312 (2d Cir. 1995).

While the Court must consider the record as a whole in making this determination, it is not for this Court to decide de novo whether the plaintiff is disabled. See Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998); Beauvoir v. Chater, 104 F.3d 1432, 1433 (2d Cir. 1997); Veino, 312 F.3d at 586 ("Where the Commissioner's decision rests on adequate findings supported by evidence having

rational probative force, we will not substitute our judgment for that of the Commissioner."). The Court must uphold the Commissioner's decision upon a finding of substantial evidence, even when contrary evidence exists. See Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder." (citation omitted)); see also DeChirico, 134 F.3d at 1182-83 (affirming an ALJ decision where substantial evidence supported both sides).

Finally, it is the function of the Commissioner, not the Court, "to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." Aponte v. Sec'y, Dep't of Health & Human Servs., 728 F.2d 588, 591 (2d Cir. 1984) (quoting Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 642 (2d Cir. 1983)) (internal quotation mark omitted); see also Gernavage v. Shalala, 882 F. Supp. 1413, 1419 n.6 (S.D.N.Y. 1995) ("Deference should be accorded the ALJ's [credibility] determination because he heard plaintiff's testimony and observed his demeanor." (citations omitted)). An ALJ's decision on credibility "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." Soc. Sec. Ruling 96–7p, 61 Fed. Reg. 34484.

D.    The Treating Physician Rule

"[T]he treating physician rule generally requires deference to the medical opinion of a claimant's treating physician," although an ALJ need not afford controlling weight to a treating physician's opinion that is "not consistent with other substantial evidence in the record, such as the opinions of other medical experts." Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004) (citations omitted); see also Burgess, 537 F.3d at 128.  An ALJ who does not accord controlling weight to the medical opinion of a treating physician must consider various factors, including "(i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; [and] (iv) whether the opinion is from a specialist."  Halloran, 362 F.3d at 32 (citing 20 C.F.R. § 404.1527(d)(2)). After considering these factors, the ALJ must "comprehensively set forth reasons for the weight assigned to a treating physician's opinion." Id. at 33.

Although the ALJ will consider a treating source's opinion as to whether a claimant is disabled or able to work, the final responsibility for deciding those issues is reserved to the Commissioner, and the treating source's opinion on them is not given "any special significance."  20 C.F.R. § 416.927(d)(3); see also Soc. Sec. Ruling 96-5p, 1996 WL 374183, at *3 (July 2, 1996); Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999).  When a finding is reserved to the Commissioner, "the Social Security Administration considers the data that physicians provide but draws its own conclusions as to whether those data indicate disability.  A treating physician's

18

statement that the claimant is disabled cannot itself be determinative." Snell, 177 F.3d at 133.  It is the ALJ's duty, as the trier of fact, to resolve conflicting medical evidence.  See Richardson, 402 U.S. at 399.

   E.   The ALJ's Duty to Develop the Record

Although "[t]he claimant has the general burden of proving that he or she has a disability within the meaning of the Act," "the ALJ generally has an affirmative obligation to develop the administrative record." Burgess, 537 F.3d at 128 (citations and internal quotation marks omitted).  SSA regulations require an ALJ to "inquire fully into the matters at issue and . . . receive in evidence the testimony of witnesses and any documents which are relevant and material to such matters." Id. (quoting 20 C.F.R. § 702.338).  "In light of the ALJ's affirmative duty to develop the administrative record, 'an ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record.'" Id. at 129 (citation omitted); see also Calzada v. Asture, 753 F. Supp. 2d 250, 277 (S.D.N.Y. 2010) ("If the ALJ is not able to fully credit a treating physician's opinion because the medical records from the physician are incomplete or do not contain detailed support for the opinions expressed, the ALJ is obligated to request such missing information from the physician." (citing Perez, 77 F.3d at 47)).

III   DISCUSSION

The ALJ correctly conducted the five-step analysis required by 20 C.F.R. §§ 404.1520 and 416.920.  The ALJ's determinations at steps one through three are not challenged.

A.      Treating Physicians' Opinions

Plaintiff's first argument is that, at step four, the ALJ "failed to properly apply the treating physician rule when he considered the opinions of all three treating physicians that submitted opinions in this case." (Pl.'s Mem. at 3.) The Court disagrees.

In giving limited weight to Drs. Baez's, Calderon's, and Kam's assessments, the ALJ properly considered the factors in 20 C.F.R. § 416.927, stated the weight he gave to each of the opinions, and gave an explicit rationale for his determination in that regard. See Halloran, 362 F.3d at 32.

1.      Dr. Joe Baez

ALJ Rodriguez found that Dr. Baez's opinion was inconsistent with the clinical and diagnostic medical evidence in the record—including his own objective observations—and thus did not give it controlling weight. (Tr. 26.) 20 C.F.R. § 416.927(c)(2). This was proper. In Dr. Baez's May 1, 2013 Medical Source Statement he indicated that plaintiff had a very long list of symptoms[4], had "marked loss" in sixteen work-related mental abilities, and that these impairments would cause plaintiff to be absent from work more than three times a month. (Tr. 468-471.) ALJ Rodriguez found that this report of severe limitations was inconsistent with Dr. Baez's treatment notes dated the very same day. As discussed

---

[4] Poor memory, appetite disturbance with weight change, sleep disturbance, mood disturbance, emotional lability, delusions or hallucinations, recurrent panic attacks, paranoia or inappropriate suspiciousness, feelings of guilt or worthlessness, difficulty thinking or concentrating, decreased energy, persistent irrational fears, generalized persistent anxiety, and hostility and irritability. (Tr. 467).

above, Dr. Baez's May 1, 2013 treatment notes indicated that plaintiff was alert, oriented, showed no psychomotor disturbance, was not reporting auditory or visual hallucinations, was not reporting delusions or paranoia, had no recent significant weight loss or gain, displayed fair insight, judgment, and impulse control, had a stable mood, and was cooperative and pleasant.  (Tr. 442-44.)  Subsequent treatment notes from May 15, 2013 and June 12, 2013 also indicate plaintiff was cooperative, alert, and oriented and are inconsistent with the May 1, 2013 Medical Source Statement.  (Tr. 447, 450.)

In addition to being inconsistent with his own treatment notes, Dr. Baez's Medical Source Statement is inconsistent with the opinion of Dr. Arlene Broska,[5] a consultative examiner.  On July 23, 2012, Dr. Broska examined plaintiff and opined that plaintiff could follow and understand simple directions and instructions, perform simple and complex tasks independently, maintain attention and concentration, and make some appropriate decisions.  (Tr. 269.)  In sum, she found that "the results of the examination appear to be consistent with psychiatric problems, but in itself, this does not appear significant enough to interfere with [plaintiff's] ability to function on a daily basis."  (Id.)

Thus, because Dr. Baez's opinion was inconsistent with the record as a whole, the ALJ properly did not give it controlling weight.  20 C.F.R. § 416.927(c)(4).

---

[5] Plaintiff seeks to discredit Dr. Broska's evaluation because their meeting was conducted with a Spanish interpreter, Pl.'s Mem. at 6, n1, but the treatment notes of Dr. Baez, whom plaintiff seeks to credit, indicate that he also used a Spanish interpreter.  (Tr. 442.)

2.   Dr. Cecilia Calderon

ALJ Rodriguez found the opinion of Dr. Calderon, another of plaintiff's treating physicians, was "generally consistent with the medical evidence of record and the objective findings of the consultative examiner" and accordingly gave it "some weight." (Tr. 26.)  In a Medical Source Statement completed on October 8, 2012, Dr. Calderon opined that plaintiff could frequently lift and carry up to 50 pounds, had no limitations in using his hands for reaching, handling, or working with his fingers, and did not need an assistive devices to walk. (Tr. 457-58).  These statements were consistent with the medical record as a whole.  For example, the findings are consistent with the opinion of Dr. Mescon, plaintiff's consultative examiner, who opined that plaintiff had intact hand and finger dexterity, full grip strength, full strength in his upper and lower extremities, and no limitations in his ability to sit, stand, climb, push, pull, or carry heavy objects. (Tr. 265.)

The ALJ did not give controlling weight to the portions of Dr. Calderon's opinion that were inconsistent with the medical record. 20 C.F.R. § 416.927(c)(4). This was proper.  Most significantly, Dr. Calderon diagnosed plaintiff with DVT in his left leg on October 8, 2012 (Tr. 453); that diagnosis is inconsistent with the objective medical evidence, specifically ultrasound results from April 7, 2012 which reported that plaintiff had "[n]o DVT in the left lower extremity."[6] (Tr. 247.)  In fact, Dr. Calderon seems to have placed plaintiff on Coumadin, an anticoagulant,

---

[6] Plaintiff alleges that the ALJ improperly substituted his own medical opinion when he found that plaintiff's allegations of DVT were not supported by clinical or diagnostic findings. Pl.'s Mem. at 8, n2.  The objective medical record, however, affirmatively indicates plaintiff did not have DVT. (Tr. 247.)

because a report from Bronx Lebanon Hospital indicated that plaintiff had DVT, but Dr. Yair Lev of Bronx Lebanon Hospital could find no such record when plaintiff checked into Bronx Lebanon Hospital in December 2012.  When Dr. Lev alerted Dr. Calderon there was no report from Bronx Lebanon Hospital indicating plaintiff had DVT, Dr. Calderon stopped plaintiff's anticoagulation medicine that day.  (Tr. 343.)

### 3.   Dr. Michelle Kwan Kam

ALJ Rodriguez properly gave "little weight" to the opinion of Dr. Michel Kwan Kam, plaintiff's other treating physician, because it was "inconsistent with the medical evidence of record including the recent treatment notes indicating the claimant's symptoms have improved with treatment and the objective findings of the consultative examiners."  (Tr. 26.)  Specifically, Dr. Kam indicated plaintiff had extensive limitations, but Dr. Mescon's evaluation flatly contradicted this opinion.[7] Dr. Kam's statement that plaintiff could only occasionally carry eleven to twenty pounds and could never carry anything heavier (Tr. 282) was also inconsistent with the opinion of another treating physician, Dr. Calderon, who opined that plaintiff could frequently carry up to fifty pounds.  (Tr. 457.)

ALJ Rodriguez considered the factors required under 20 C.F.R. § 416.927, and set forth specific reasons in the record evidence for not assigning controlling weight to Drs. Baez's, Calderon's, and Kam's opinions.  The Court's review of the Administrative Record demonstrates that the ALJ's determination was based upon

---

[7] Plaintiff seeks to discredit Dr. Mescon on the ground that her report was "inherently inconsistent." Pl.'s Mem. at 9, n3.  Minor inaccuracies regarding left and right are not enough to discredit a physician's entire evaluation.

substantial evidence.  See Mongeur v. Heckler, 722 F.2d 1033, 1039 (2d Cir. 1983) ("The opinion of a treating physician is not binding if it is contradicted by substantial evidence.").  Thus, the ALJ appropriately assessed that plaintiff had the residual functional capacity to perform a full range of work at all exertional levels limited to unskilled, low-stress jobs involving no interaction with the public, no unprotected heights or loud noises, and dealing with things rather than people and requiring only occasional decision-making and work-related interaction with coworkers.  (Tr. 22.)

B.  Assistive Device

Plaintiff's second argument in support of his position is that the ALJ failed to consider "the overwhelming evidence that [he] needs a cane to ambulate."  (Pl.'s Mem. at 9.)  The Court, however, finds that the ALJ did not err regarding plaintiff's alleged use of a cane.

Plaintiff's claim that he needs a cane is inconsistent with the record as a whole.  As evidence that he needs a cane to walk, plaintiff cites his Dr. Kam's Medical Source Statement and his hearing testimony.  (Tr. 295, 54-55).  However, plaintiff's claim that he needs a cane to walk is contradicted by Dr. Calderon's Medical Source Statement, which plaintiff seeks to credit as an opinion of a treating physician and which indicates plaintiff does not need to use a cane to walk (Tr. 458), and Dr. Mescon's evaluation, which indicates that plaintiff did not use a cane, had a normal gait and stance, could squat fully, could walk on his heels and toes without

24

difficulty, and had limitation in his ability to sit, stand, climb, push, pull, or carry heavy objects, (Tr. 264-65).

Furthermore, plaintiff admits he has not obtained and does not use a cane to walk. (Tr. 54-55, Pl.'s Mem. at 9.) Plaintiff urges the Court to view this fact as an indication of plaintiff's extremely weak upper body; plaintiff claims his arms would become numb if he used a cane. (Tr. 54-55, Pl's. Mem. at 9.) However, there is no objective medical evidence of weak upper body strength or arm-numbness. Results from a musculoskeletal evaluation conducted in December 2012 were normal. (Tr. 334.) Additionally, Dr. Mescon's evaluation indicates that plaintiff had full range of motion in his shoulders, elbows, forearms, and wrists bilaterally, had full strength in his upper extremities, and no evident muscle atrophy. (Tr. 265.) Thus, the Court views the fact that plaintiff does not use a cane to walk as an indication that plaintiff does not need to use a cane to walk and accordingly finds the ALJ did not err regarding plaintiff's alleged use of a cane.

C.     Medication Side Effects

Plaintiff's third argument in support of his position is that the ALJ failed to consider the alleged side effects of his medication. (Pl.'s Mem. at 10.) Plaintiff's side effects from medication are detailed throughout the administrative record, although the nature of the side effects varies: plaintiff testified he has nose bleeds (Tr. 50), urinates blood (Id.), and experiences dizziness, nausea, and loss of appetite (Tr. 53); Dr. Baez indicated that plaintiff reported trouble with his sleep cycle (Tr. 443, 447), diminished sexual function (Tr. 442-43), nausea (Tr. 468), and upset

stomach (Id.); Dr. Broska reported that plaintiff had difficulty sleeping and poor appetite (Tr. 267); Dr. Calderon reported that plaintiff experience upset stomach and drowsiness (Tr. 454); Dr. Kam reported that plaintiff experienced nausea and stomach upsets (Tr. 279).  The only physician who did not indicate plaintiff had side effects was Dr. Mescon.  (Tr. 263-66.)

The ALJ recognized plaintiff's side effects: he noted that Dr. Broska, whose opinion he gave "great weight," reported that plaintiff had difficulty falling asleep and poor appetite.  (Tr. 24.)  Ultimately, however, the ALJ determined plaintiff was not credible as to his complaints because "[t]he objective medical findings reveal some limitations, but not to the extent alleged by [plaintiff]."  (Tr. 25.)

In assessing a claimant's credibility, "after weighing objective medical evidence, the claimant's demeanor, and other indicia of credibility," and ALJ "may decide to discredit the claimant's subjective estimation of the degree of impairment."  Tejada, 167 F.3d at 776 (citation omitted).  As with any finding of fact, "[i]f the Secretary's findings are supported by substantial evidence . . . the court must uphold the ALJ's decision to discount a claimant's subjective complaints of pain."  Perez v. Barnhart, 234 F.Supp.2d 336, 341 (S.D.N.Y. 2002) (quoting Aponte, 728 F.2d at 591).  An ALJ's credibility determination is thus entitled to deference unless it is not set forth "with sufficient specificity to enable [a reviewing court] to decide whether [it] is supported by substantial evidence."  Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984).

Here, the ALJ properly referenced specific reasons for assigning limited weight to plaintiff's testimony regarding side effects. (Tr. 23, 25-26.) <u>See</u> Social Security Ruling (SSR) 96-7P, Dept. of Health and Human Services (July 1996). The Court therefore accepts ALJ Rodriguez's credibility determination and finds no error on this point.

D.    <u>Combination of Mental and Physical Impairments</u>

Plaintiff's fourth argument in support of his position is that the ALJ failed to consider that his mental and physical impairments in combination when determining his residual functional capacity. (Pl.'s Br. at 11.) The ALJ, however, twice expressly stated that he had considered plaintiff's impairments in combination: he found plaintiff's impairments to be "severe, in combination if not singly," (Tr. 20), and he "considered all of [plaintiff's] impairments individually and in combination." (Tr. 21.) In light of the ALJ's explicit acknowledgement of the need to consider impairments in combination, the Court rejects this argument.

Plaintiff further argues that the ALJ failed to consider the fact that plaintiff is illiterate in English when he considered plaintiff's residual functional capacity. (Pl.'s Mem. at 11.) According to the guidance in 20 C.F.R. § Pt. 404, Subpt. P, App. 2., however, "literacy or ability to communicate in English has the least significance" in the context of "unskilled work," which primarily involves "working with things (rather than with data or people)." 20 C.F.R. § Pt. 404, Subpt. P, App. 2. In this case, the ALJ found plaintiff had the residual functional capacity to perform unskilled work limited to jobs dealing with things rather than people. (Tr.

22.)  Thus, plaintiff's illiteracy does not have high significance and the ALJ did not

err in not explicitly considering it in his written decision.

      E.    <u>Vocational Expert Testimony</u>

      Finally, plaintiff argues that, because the ALJ found that he had

nonexertional limitations, he was required to obtain vocational expert testimony.

(Pl.'s Mem. at 13.)  The Court disagrees.

      While "sole reliance on the [Medical-Vocational Guidelines, or "Grids,"] may

be inappropriate where the claimant's exertional impairments are compounded by

nonexertional impairment . . . 'the mere existence of a nonexertional impairment

does not automatically require the production of a vocational expert nor preclude

reliance on the guidelines.'" <u>Roma v. Astrue</u>, 468 F. App'x 16, 21 (2d Cir. 2012)

(citing <u>Bapp v. Bowen</u>, 802 F.2d 601 (2d Cir. 1986)).  It is only when a "claimant's

work capacity is significantly diminished beyond that caused by his exertional

impairment the application of the grids is inappropriate." <u>Id.</u> at 605-06.

"Significantly diminished" indicates an "additional loss of work capacity . . . that so

narrows a claimant's possible range of work as to deprive him of a meaningful

employment opportunity." <u>Id.</u> at 606.

      In this case, the ALJ found that while plaintiff's ability to "perform work at

all exertional levels ha[d] been compromised by nonexertional limitations," the

"limitations ha[d] little or no effect on the occupational base of unskilled work at all

exertional levels."  (Tr. 27.)  For plaintiff to do unskilled work, he must have "the

abilities (on a sustained basis) to understand, carry out, and remember simple

instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting." SSR 85-15, Dept. of Health and Human Services (Jan. 1985). None of the nonexertional limits identified by the ALJ—no unprotected heights or exposure to loud noises; no more than occasional decision making or exercise of judgment in job performance; no interactions with the public; occasional work-related interaction with co-workers and supervisors; jobs dealing with things rather than people—narrows plaintiff's possible range of unskilled work so as to deprive him of meaningful employment opportunities. (Tr. 22.) Thus, plaintiff's nonexertional limitations did not result in an additional loss of work capacity, and the ALJ properly relied on the Grids.

## IV.   CONCLUSION

For these reasons, defendant's motion for judgment on the pleadings is GRANTED and plaintiff's motion for judgment on the pleadings is DENIED. The Clerk of Court is directed to terminate the motions at ECF Nos. 10 and 16, to enter judgment for defendant, and to terminate this action.

SO ORDERED.

Dated:      New York, New York
            July 15, 2016

_____
    KATHERINE B. FORREST
    United States District Judge

29